# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54335-4-II |
| Respondent, | |
| v. | |
| ROBERT JESSE HILL, | PART PUBLISHED OPINION |
| Appellant. | |

VELJACIC, J. — Robert Hill appeals his conviction for malicious mischief in the second degree, felony harassment, and burglary in the first degree. The charges stemmed from an incident where Hill was denied service at Urban Bud dispensary and refused to leave. Subsequently Hill engaged in a physical altercation with the security guard and then purposefully destroyed display cases and merchandise.

Hill argues that his right to a fair trial was tainted by jury misconduct and that the trial court abused its discretion by denying his motion for a mistrial. Hill also argues that the State violated his right to a unanimous verdict by failing to prove both alternative means of committing burglary, that the prosecutor committed misconduct by urging the jury to speculate about evidence outside the record and by misstating the burden of proof, and that cumulative error denied his right to a fair trial. Hill asserts that the trial court abused its discretion by failing to consider his request for an exceptional sentence. In his statement of additional grounds (SAG), he also argues that the State failed to present sufficient evidence of burglary in the first degree, he received ineffective assistance of counsel, and the prosecutor committed misconduct.

In the published portion of this opinion, we conclude that the court did not abuse its discretion in denying Hill's motion for a mistrial because Hill failed to show juror misconduct. In the unpublished portion, we conclude that burglary in the first degree is not an alternative means crime, and the State produced sufficient evidence to support the conviction. Additionally, we conclude that the prosecutor did not commit misconduct, Hill was not prejudiced by cumulative error, and the trial court did not abuse its discretion because it did not categorically refuse to consider mitigating evidence at sentencing. Finally, we conclude that Hill's SAG claims have no merit. Accordingly, we affirm.

FACTS

## I. INCIDENT AT URBAN BUD

On August 31, 2019, Hill walked into Urban Bud dispensary. Hill had consumed several alcoholic drinks that afternoon and evening. Upon entering Urban Bud, Hill stopped just inside the door at a podium that acted as a "security check-in station." 3 Report of Proceedings (RP) at 214. Hill began to write on a clipboard on the podium, erroneously believing it was a sign-in sheet. Alvaro Salaverry, in his position as security guard, was in charge of checking customer identification before allowing them in the store. Salaverry was not at the station when Hill entered, but returned and asked Hill to leave, Hill refused, and eventually attempted to walk past Salaverry into the store. Salaverry grabbed Hill by his back pocket, pulling him backwards, and causing him to fall. They struggled and at one point Salaverry attempted to drag Hill out of the front door. Eventually, Salaverry restrained Hill by kneeling on his back or shoulder.

After hearing shouting from the front of the store, the store manager Christian Muridan walked over and saw Salaverry on the ground struggling to restrain Hill, who was "incoherent [and] screaming." 3 RP at 203. Muridan smelled alcohol when he approached and told Hill that he needed to leave "at least five times in his face," but received no response or acknowledgement that Hill had heard him. 3 RP at 203. Muridan called the police. Another employee, Ashlyn Thomas, also smelled alcohol when she approached and saw Hill "sprawled out on the ground screaming." 4 RP at 346. Thomas heard Hill yell for someone to call the police because someone was hurting him. Muridan told Salaverry to let Hill up to allow him to leave. Hill stood up and ran toward the back of the store and tried to kick open the unmarked door of the employee breakroom.

Salaverry tackled Hill in the breakroom doorway and attempted to restrain him with his arm around Hill's neck. Hill continued to shout and eventually turned his head and bit Salaverry's forearm, causing Salaverry to release him. Hill kicked out at Salaverry, grazing his nose. Hill got up off the floor, picked up the jug and base of a water dispenser from inside the breakroom and threw it into the middle of the store. He then began kicking nearby display cases containing glass paraphernalia, damaging the display's glass, doors, and contents.

Urban Bud had significant security measures including a security camera system that captured the incident from multiple angles.

The police eventually arrived and placed Hill under arrest. The State charged Hill by amended information with assault in the second degree, malicious mischief in the second degree, felony harassment, and burglary in the first degree. The matter proceeded to a jury trial.

II.     JURY DELIBERATIONS

After the close of evidence, the jury began deliberating in the afternoon and continued into a second day.  At 10:03 AM, the jury submitted a questions to the court.[1]  At 10:42, the jury informed the judicial assistant (JA) that it was deadlocked on one of the counts.  At 10:51, juror 2 informed the JA that they wanted to leave, and when the jury was excused for a break 20 minutes later, juror 2 further informed the JA that they were "getting threats."  6 RP at 534.

After consulting with the parties about juror 2's complaints, the judge polled the jury on whether it could reach a verdict on the remaining count and the jury unanimously agreed that it could not.  Hill and the State agreed that the jury was deadlocked and agreed to voir dire juror 2 to determine whether they could continue to deliberate.  The court then engaged in the following colloquy with juror 2:

> THE COURT: . . . I am going to ask that you not disclose anything about the—who's voted how or what the actual vote is on any count at this point.
> Based on my polling of the jury, I understand that the jury is unable to agree on one of the counts.  I don't know what that is.  I don't want to know at this point.
> JUROR NO. 2: Okay.
> THE COURT: But I was concerned about the fact that you indicated to [the JA] that at one point you felt like you needed to leave
> JUROR NO. 2: Uh-huh.  (Juror answers affirmatively.).
> THE COURT: And we['re re concerned about the way another or other jurors had been addressing you.
> JUROR NO. 2: Yes.
> THE COURT: And I think that you had indicated to [the JA] that it was threatening or felt?
> JUROR NO. 2: Yes.
> THE COURT: Could you go into a little more detail without letting us know how the jury has voted or who has voted?

---

[1] The jury asked, "Is it necessary that the defendant spoke a threat to kill Salaverry for it to be a threat?  Can the threat be a perceived act or behavior?"  6 RP at 530.  The court responded, "Please review Instruction 22."  6 RP at 530.  The jury also asked, "If defendant is guilty of criminal trespass, can he also claim self-defense?"  6 RP at 531.  The court answered, "Please refer to Instruction 31."  6 RP at 532.

JUROR NO. 2: That it—karma should come back at me, and someone should come to my house and do that to me, and [juror X] hopes that I am the next person that that happens to if I don't agree with [them].

THE COURT: . . . Do you think at this time you can continue[?]

JUROR NO. 2: Yes, I can.

6 RP at 541-43.

Hill's counsel also questioned the juror and confirmed what juror X said, and that juror 2 had felt threatened by it.

The court opined that it did not believe it needed to dismiss or replace juror 2 because they indicated that they could continue, and the presiding juror indicated that the jury had been able to reach a verdict on three of the counts. The State agreed. Defense counsel moved for a mistrial, arguing, "Because we don't know when in the deliberation process those threats occurred, we don't know if that was for a particular count. . . . And it's clear that [Juror 2] feels intimidated; although, [the juror] felt that [they] could continue. You know, we can't unring that bell." 6 RP at 545. The court opined that it was not "that unusual for deliberations to get heated and people to say untoward things." 6 RP at 546. The court then denied the motion for a mistrial.

The jury found Hill guilty of malicious mischief in the second degree, felony harassment, and burglary in the first degree, but did not reach a verdict on assault in the second degree. The court polled the jury and confirmed the verdict. Hill appeals.

ANALYSIS

I.  JUROR MISCONDUCT

Hill argues that juror X committed misconduct that violated his right to a fair trial by an impartial jury when they threatened another juror. He also argues that the trial court erred by failing to grant a mistrial or ensuring that he was not prejudiced by interviewing other jurors. Hill contends that because the error was structural, it was not harmless.

5

The State argues that we should not consider the alleged misconduct because it inhered to the verdict, and therefore, the court did not abuse its discretion in denying the motion for a mistrial. The State also argues that Hill fails to prove that the juror's comment was misconduct, rather than just a heated discussion. We agree that Hill failed to prove juror misconduct.

A.    Juror 2's Testimony Does Not Inhere to the Verdict

Central to the jury system is the secrecy of jury deliberations. *Long v. Brusco Tug & Barge, Inc.*, 185 Wn.2d 127, 131, 368 P.3d 478 (2016). Courts will not consider allegations of jury misconduct that inhere in the verdict. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 568, 397 P.3d 90 (2017). "'[F]acts linked to the juror's motive, intent, or belief, or describ[ing] their effect upon the jury' or facts that cannot be rebutted by other testimony without probing any juror's mental processes" are matters that inhere to the verdict. *Id*. (internal quotation marks omitted) (quoting *Long*, 185 Wn.2d at 131). "'Only if a court concludes that juror declarations allege actual facts constituting misconduct, rather than matters inhering in the verdict, does it proceed to decide the effect the proved misconduct could have had upon the jury.'" *Id*. (internal quotation marks omitted) (quoting *Long*, 185 Wn.2d at 132).

Further,

> [i]t is not for the juror to say what effect the remarks may have had upon his verdict, but he may state facts, and from them the court will determine . . . the probable effect upon the verdict. It is for the court to say whether the remarks made by the juror in this case probably had a prejudicial effect upon the minds of the other jurors.

*State v. Reynoldson*, 168 Wn. App. 543, 548, 277 P.3d 700 (2012) (quoting *State v. Parker*, 25 Wash. 405, 415, 65 P. 776 (1901)); *see also State v. Marks*, 90 Wn. App. 980, 986, 955 P.2d 406 (1998) ("Jurors may provide only factual information regarding actual conduct alleged to be misconduct, not about how such conduct affected their deliberations."); *State v. Forsyth*, 13 Wn.

App. 133, 138, 533 P.2d 847 (1975) ("[T]he trial court may consider statements of *fact* set forth in the affidavit, but may not consider a juror's statement of the *effect* such facts had upon the verdict.").

The testimony of juror 2 did not probe into their own or others' mental process. Juror 2 stated what juror X said to them and that they felt threatened. They provided factual information regarding the conduct alleged. Juror 2 did not state what effect juror X's statements had on their deliberations or other jurors' thought processes. Further, the fact could be rebutted by testimony without probing into other jurors' mental states. The court could have called juror X, who could have confirmed or denied that they made the threat alleged without discussing their mental process. The fact specifically alleged here does not inhere to the verdict, so we will consider whether juror X's statement was misconduct.

B.     The Statement Does Not Rise to the Level of Misconduct

Under the United States Constitution, the Sixth and Fourteenth Amendments guarantee persons accused of a crime the right to a fair trial by an impartial jury. *State v. Davis*, 141 Wn.2d 798, 824-25, 10 P.3d 977 (2000). Article I, section 22 of the Washington State Constitution provides a similar right. *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 851, 456 P.3d 869, *review denied*, 195 Wn.2d 1025 (2020). However, the right to a fair trial does not require a "perfect" trial. *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 267, 172 P.3d 335 (2007).

A party alleging juror misconduct has the burden to show misconduct occurred. *Reynoldson*, 168 Wn. App. at 547; *State v. Hawkins*, 72 Wn.2d 565, 568, 434 P.2d 584 (1967). A strong, affirmative showing of misconduct is required to "overcome the policy favoring stable and certain verdicts and the secret, frank and free discussion of the evidence by the jury." *State v. Balisok*, 123 Wn.2d 114, 117-18, 866 P.2d 631 (1994). A new trial is warranted "only where juror

7

misconduct has prejudiced the defendant." *Reynoldson*, 168 Wn. App. at 548; *State v. Depaz*, 165 Wn.2d 842, 856, 204 P.3d 217 (2009).

There is a lack of Washington case law concerning a claim of misconduct based specifically on one juror threatening another, and none that establish what level the challenged behavior must reach in order to be misconduct. Accordingly, we glean principles from similar Washington cases as well as out-of-state authority to resolve the issue.

In a similar case, *State v. Earl*, a juror asked to be dismissed from deliberations and presented a letter from her psychologist indicating that she should not continue because she was in "psychological crisis" based on the fact that another juror had "verbally attacked her, called her insulting names, and impugned her integrity." 142 Wn. App. 768, 771, 177 P.3d 132 (2008). The court questioned the presiding juror, and determined that there were no problems with the jury. *Id.* at 773. It also questioned the juror, determined that she could not continue, and dismissed her. *Id.* The court elected not to identify or question the juror who made the insulting comment and told the jury to begin deliberations anew with an alternate juror. *Id.* at 771-73. Earl appealed, arguing in part that the trial court abused its discretion in failing to grant a mistrial, and in limiting the scope of the inquiry into the misconduct. *Id.* at 774. We disagreed, holding that Earl failed to meet his burden to show misconduct and that "[a] personal remark, even a derogatory one, between jurors during a deliberation break, is not juror misconduct if it does not involve the substance of the jury's deliberations." *Id.* at 775-76.

Other jurisdictions have similarly held that the court must balance the interest in maintaining the secrecy of jury deliberations with the right of the defendant to a fair trial. In order to affect that balance, courts will generally overturn a jury verdict for misconduct only if juror conduct is egregious enough to effect a juror's ability to engage in free and frank deliberation.

For example, in Colorado, courts have held that a juror's acts constitute misconduct "only if the alleged coercive acts [first] rise to the level of continuous violent, abusive, and profane language and conduct threatening or amounting to physical violence against a juror." *People v. Mollaun*, 194 P.3d 411, 418 (Colo. App. 2008). "To warrant a new trial, the evidence must reveal more than expressions of frustration, impatience, annoyance, or empty threats." *People v. Rudnick*, 878 P.2d 16, 22 (Colo. App. 1993). Similarly, Minnesota courts have held that a juror's acts rise to misconduct when one juror commits or threatens actual physical violence towards another juror. *State v. Jackson*, 615 N.W.2d 391, 396 (Minn. App. 2000). However, "[e]vidence of *psychological* intimidation, coercion, and persuasion" may not be used to establish a claim of juror misconduct in Minnesota. *Id*. (emphasis added).

Likewise, in Oregon, a juror commits misconduct when their actions "'amount[] to fraud, bribery, forcible coercion or any other obstruction of justice that would subject the offend[ing juror] to a criminal prosecution.'" *Hill v. Lagrand Indus. Supply Co.*, 193 Or. App. 730, 735, 91 P.3d 768 (2004) (quoting *Carson v. Brauer*, 234 Or. 333, 345-46, 382 P.2d 79 (1963)).

Finally, in *People v. Keenan*, the California Supreme Court reviewed a claim of misconduct arising from one juror stating to another: "'If you make this all for nothing, if you say we sat here for nothing, I'll kill you and there'll be another defendant out there—it'll be me.'" 46 Cal. 3d 478, 540, 758 P.2d 1081 (1988). There, the court concluded that the statement "was but an expression of frustration, temper, and strong conviction against the contrary views of another panelist," and rejected the defendant's motion for a new trial. *Id*. at 541.

As discussed above, the party alleging juror misconduct maintains the burden to show that misconduct occurred. *Reynoldson*, 168 Wn. App. at 547. Based on the foregoing authorities, we hold that a juror commits misconduct only if the alleged coercive acts rise to the level of actual or

threatened physical violence or abuse. But mere expressions of frustration, temper, empty threats, and strong conviction against the contrary views of another panelist are insufficient to establish a claim of juror misconduct.[2]

Here, juror X, obviously disagreeing with some position taken by juror 2, told juror 2 that "karma should come back at [them], and someone should come to [juror 2's] house and do that to [them], and [juror X] hopes that [juror 2 is] the next person that that happens to." 6 RP at 542.

While at the time, juror 2 may have subjectively felt intimidated or threatened, the statement was not a threat. *See Anderson v. Miller*, 346 F.3d 315, 329 (2d Cir. 2003) (holding that a *reasonable* juror, standing in the shoes of the jurors who had been threatened by another juror, would not have thought themselves to be facing a physical assault if they refused to vote for conviction). There is no indication that the statement was more than "an expression of frustration, temper, and strong conviction against the contrary views of another panelist." *Keenan,* 46 Cal. 3d at 541. Juror X was telling juror 2 to put themselves in the victim's place, albeit in an extremely offensive and disrespectful way. Furthermore, although juror 2 felt threatened, they were able to continue deliberating. The actions were not misconduct.

We conclude that Hill has failed to meet his burden of a strong, affirmative showing of misconduct that is "necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank and free discussion of the evidence by the jury." *Balisok*, 123 Wn.2d at 117-18.

---

[2] We note that, even if a party successfully demonstrates juror misconduct, such misconduct must nevertheless be prejudicial to warrant reversal. *See Reynoldson*, 168 Wn. App. at 548; *See also Depaz*, 165 Wn.2d at 856.

C.       The Court Did Not Abuse its Discretion by Failing to Conduct Further Inquiry into the Allegation of Juror Misconduct

A trial judge has broad discretion to conduct an investigation of jury problems and may investigate accusations of juror misconduct in the manner most appropriate for a particular case. *Elmore*, 155 Wn.2d. at 773-75; *see also Earl*, 142 Wn. App. at 774-76 (holding that the trial court may limit the scope of its inquiry where the moving party does not satisfy its burden of proving juror misconduct or prejudice).

"We review a trial court's investigation of juror misconduct for abuse of discretion," which occurs when the trial court "acts on untenable grounds or its ruling is manifestly unreasonable." *State v. Gaines*, 194 Wn. App. 892, 896, 380 P.3d 540 (2016). We also apply the same standard in reviewing the trial court's denial of a mistrial, finding an abuse of discretion only when "'no reasonable judge would have reached the same conclusion.'" *State v. Rodriguez*, 146 Wn.2d 260, 269, 45 P.3d 541 (2002) (quoting *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989).

The court appropriately questioned the juror to which the statement had been made and confirmed that the juror was able to continue deliberating. Both parties were given the opportunity to question juror 2, and Hill did not ask the court to question juror X. Because Hill failed to make any affirmative, prima facie showing of misconduct, the trial court's limitation of its inquiry into the alleged misconduct was not an abuse of discretion. Accordingly, the trial court also did not abuse its discretion in denying Hill's motion for a mistrial.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

11

FACTS RELATING TO UNPUBLISHED PORTION OF OPINION

I.      TRIAL

At trial, Salaverry and Hill testified about their versions of events.  Urban Bud employees Muridan and Thomas, and general manager Errol Franada also testified; as did the 911 dispatcher and the arresting police officers.

Salaverry testified that he had a background training in mixed martial arts.  He testified that when he first approached, Hill was incoherent and smelled of alcohol.  The men got into an argument over why Hill was writing on his perimeter report paperwork.  Salaverry told Hill that they were not going to sell to him because he was intoxicated and he needed to leave.  Salaverry testified that he had his arm around Hill's neck when they were struggling on the breakroom floor but he used a "side choke" so that one side of Hill's neck was still exposed, leaving him able to breathe and talk.  3 RP at 277.  At some point during the struggle, Hill said to Salaverry, "I'm going to . . . kill you."  3 RP at 283.

Hill testified that when Salaverry first approached him, he did not identify himself as security or an employee of the store.  Although Hill was aware that he would be required to show identification (ID) to enter the store, he testified that he asked Salaverry to talk to a manager to get an exception because he did not have ID.  Hill walked further into the store despite being asked to leave because he wanted to speak to a manager.  He testified that he ran to the back of the store looking for an exit and didn't use the front door because he was afraid of Salaverry who was standing in his way.  Hill testified that he bit Salaverry because "he was hurting [him] . . . and [he] was worried about being killed or at least being made unconscious."  4 RP at 459.  He denied threatening Salaverry.  Hill testified that he threw the water jug because he was afraid, and he

kicked and damage the display case because he was "under the emotional drama . . . of the moment." 4 RP at 424.

Franada testified to the cost of the damages to the merchandise and display case. The court admitted exhibits from Franada listing the wholesale and retail value of the items damaged, as well as invoices and quotes of the replacement glass, doors, and lights of the display cases.

At closing, Hill pointed out five separate times that the surveillance footage did not have audio. He stated that it was "surprising" that there is no audio, despite having a state-of-the-art surveillance video system. 5 RP at 503. Hill also argued that the jury only had Salaverry's word as to the nature of their argument and as to whether Hill threatened to kill Salaverry. In regard to the testimony by Franada concerning the cost of the damages to the display cases and merchandise, Hill argued:

> And he's not the owner, he's the general manager. And he used to work at a gym as a personal trainer, apparently. But his recordkeeping system is not a model of clarity. You saw pictures of a bunch of broken stuff that was most likely thrown away. It wasn't brought in here, wasn't matched up to the inventory list. We couldn't go through it, this is what was broken, this is not broken, this is what was broken, so you do have to take Mr. Franada at his word. And he's probably doing the best he can. But, again, we got a picture of broken stuff. If memory serves, we do not have pictures of the lights in the display case as being broken. They weren't brought in here. So that's why there's evidence to support a conviction of malicious mischief in the third degree. The dollar amount, it's below $750.

5 RP at 512-13.

In rebuttal, the State responded to Hill's assertions about Franada's credibility:

> I would submit to you there's no evidence, other evidence, as to the value of the property or that these bongs were sold anywhere else. Certainly, they've all been damaged. The receipt shows with some—specifically shows the numbers, and Mr. Franada went through them in establishing the loss and the amounts. And there's no evidence to contradict that except for defense saying you should not take him as credible, and I submit that is not sufficient.

5 RP at 515.

13

The State continued, addressing the lack of audio from the surveillance videos, stating: "And I would submit to you that no audio in the video, there's lots of explanations. I mean, nothing was brought out as testimony. Who knows what the regulations are." 5 RP at 516. The court overruled Hill's subsequent objection.

II.    SENTENCING

At sentencing, Hill requested an exceptional sentence below the standard range. He argued pursuant to RCW 9.94A 535(1)(a) that the "evidence presented at trial shows that to a significant degree, Mr. Salaverry was a willing participant or aggressor." Clerk's Papers (CP) at 242. At the sentencing hearing, Mr. Hill renewed his request for an exceptional sentence, arguing that "the physical contact was initiated by Mr. Salaverry." 7 RP at 561.

The court explained to Hill that it found the video very concerning and noted that Hill had been in and out of custody constantly over the last seven years and now had over nine felony points. The court asked Hill to comment on how this criminal behavior was going to stop. Hill was unable to provide insight into how he would restrain his criminal behavior. After hearing argument from Hill and his counsel, the court chose to follow the State's recommendation of 87 months. The court did not acknowledge Hill's request for an exceptional sentence on the record. Hill did not object or request that the court expand on its rationale.

The court entered a standard range sentence of a total of 87 months incarceration and 18 months of community custody. At a restitution hearing, the court ordered Hill to pay $1,803.23. The court calculated this amount based on: "$500 for the glass for the display case; $460 for the broken paraphernalia; $603.23 for the lights and the display case; and $240 for the doors that were destroyed." 8 RP at 578. Hill appeals.

14

III.     ALTERNATIVE MEANS

"A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime . . . assaults any person." RCW 9A.52.020(1)(b). Hill argues that the State failed to prove both alternative means of committing burglary because no evidence supported the allegation that he entered the store unlawfully.

Some crimes "may be committed in different ways (i.e., via alternative means)." *State v. Woodlyn*, 188 Wn.2d 157, 163, 392 P.3d 1062 (2017). In these cases, a guilty verdict will be upheld "only if sufficient evidence supports each alternative means." *State v. Kintz*, 169 Wn.2d 537, 552, 238 P.3d 470 (2010). Evidence is sufficient if, viewed in the light most favorable to the state, "any rational trier of fact could have found guilt beyond a reasonable doubt." *Id*. at 551.

Recently in *State v. Smith*, we held that residential burglary is not an alternative means crime. 17 Wn. App. 2d 146, 484 P.3d 550, *review denied*, 2021 WL 3929426 (2021).

"A person is guilty of residential burglary if, with intent to commit a crime against a person or property therein, the person *enters or remains unlawfully* in a dwelling other than a vehicle." RCW 9A.52.025(1) (emphasis added). In *Smith*, we reasoned that the residential burglary statute "identifies two separate acts: entering and remaining in a dwelling. But the focus of the statute is the unlawfulness of the defendant's conduct. The actual conduct the statute prohibits is being present in a dwelling *unlawfully*. Entering and remaining are merely 'nuances inhering in the same [prohibited] act' and 'facets of the same criminal conduct.'" *Smith*, 17 Wn. App. 2d at 156 (internal quotation marks omitted) (quoting *State v. Barboza-Cortes*, 194 Wn.2d 639, 646, 451

15

P.3d 707 (2019)). Thus, we concluded that the phrase "enters or remains unlawfully" does not create an alternative means offense. *Smith*, 17 Wn. App. 2d at 157.

Here, the State charged Hill with burglary in the first degree. "A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime . . . assaults any person." RCW 9A.52.020(1)(b).

As in *Smith*, the statutory language "enters or remains unlawfully in a building" does not create alternative means of committing burglary in the first degree. Therefore, the State was not required to present sufficient evidence to show that Hill unlawfully entered *and* unlawfully remained in Urban Bud. And because it is undisputed that the State provided sufficient evidence that Hill remained unlawfully, we reject Hill's argument.

IV.    PROSECUTORIAL MISCONDUCT

Hill argues that the prosecutor committed misconduct by urging the jury to speculate about evidence outside the record and by misstating the burden of proof. He contends that the prosecutor argued facts not in the evidence when he speculated about "regulations" being responsible for the lack of audio in the security. Br. of Appellant at 26. Hill argues that the prosecutor argued that he was required to disprove the value of the property damaged. Hill asserts that he was prejudiced by the misconduct.

To prevail on a claim of prosecutorial misconduct, a defendant bears the burden of showing that the comments were improper and prejudicial. *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020).

16

If the defendant fails to object to the improper statement at trial, the error is waived "unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). To prevail, the defendant must show (1) no curative instruction would have removed any prejudicial effect on the jury and (2) there is a substantial likelihood that the misconduct affected the jury's verdict. *Id.* at 761. We focus less on whether the State's misconduct was flagrant and ill-intentioned and more on whether the resulting prejudice could have been cured. *Id.* at 762.

We review a prosecutor's remarks in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the instructions to the jury. *State v. Pierce*, 169 Wn. App. 533, 552, 280 P.3d 1158 (2012). Remarks in direct response to a defense argument are generally not improper as long as they do "not go beyond what is necessary" to respond to the argument or argue evidence not in the record. *State v. Dykstra*, 127 Wn. App. 1, 8, 110 P.3d 758 (2005).

It is generally improper for the prosecutor to argue that the burden of proof rests with the defendant. *State v. Thorgerson*, 172 Wn.2d 438, 453, 258 P.3d 43 (2011). However, the mere mention that defense evidence is lacking does not constitute prosecutorial misconduct or shift the burden of proof to the defense. *State v. Jackson*, 150 Wn. App. 877, 885–86, 209 P.3d 553 (2009).

Hill argued during closing that Franada's testimony was not credible. He argued that Franada "used to work at a gym as a personal trainer . . . [and] his recordkeeping system is not a model of clarity." 5 RP at 512. He also argued that the broken items were not brought into court and matched up with the inventory list, so the jury "ha[d] to take Mr. Franada at his word." 5 RP at 513.

In response, the prosecutor noted to the jury that there was no other evidence as to the value of the property as testified to by Franada. He asserted that Franada went through the numbers and produced receipts, and "there's no evidence to contradict that except for defense saying you should not take him as credible, and I submit that is not sufficient." 5 RP at 515.

This argument was not improper. The prosecutor was responding to Hill's argument during closing, and in doing so pointed out that defense evidence was lacking to contradict Franada's testimony and the documents he provided.

Furthermore, because no objection was raised, Hill must show that the comment was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. The prosecutor reiterated during closing that the State carries the burden of proof generally. Also, when going through the elements of malicious mischief listed in instruction 16, the prosecutor specifically stated that "again, what we have to prove, the date of the crime and that the defendant caused physical damage of property . . . exceeding $750." 5 RP at 488. We conclude that the statement was not improper, and Hill fails to show that it was prejudicial and could not be cured with a remedial instruction.

Hill also argued several times during closing about the lack of audio on the security footage, at one point saying that it was "surprising" that there was no audio, given the "state of the art" surveillance system. 5 RP at 503. He asserted that due to the lack of audio, in order for the jury to accept the State's case, it had to "believe everything that [the State has] built upon testimony of Mr. Salaverry." 5 RP at 499.

Hill asserts that the prosecutor offered "regulations" as the reason why there was no audio. In fact, in responding to the defense's emphasis on the lack of audio, the prosecutor stated, "who knows what the regulations are[?]" 5 RP at 516. He did not argue facts outside of the record by

18

arguing that regulations did or did not require audio. He specifically stated that "nothing was brought out as testimony." 5 RP at 516. The argument was not improper.

Hill also fails to explain how this statement prejudiced him. He asserts that he "was entitled to explain why he was credible, and question the [S]tate's video evidence, without the prosecutor implying there was a legal explanation for the lack of audio. This bolstering and speculation prejudiced Mr. Hill." Br. of Appellant at 28. Even if the prosecutor did argue that there was a legal explanation for the lack of audio, Hill fails to explain what effect it had on the verdict. The video still had no audio, and the jury was left to determine who was more credible. Hill has failed to show that the prosecutor's statement was either improper or prejudicial and his prosecutorial misconduct claim fails. Because we have found no error or prejudicial error, Hill's cumulative error argument also fails.

V.    FAILURE TO CONSIDER MITIGATING EVIDENCE

Hill argues that the trial court abused its discretion by failing to consider the mitigating circumstance he raised at his sentencing.

When a trial court is called on to make a discretionary sentencing decision, the court must meaningfully consider the request in accordance with the applicable law. *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). When a defendant requests an exceptional sentence, appellate review is limited to circumstances when the trial court refused to exercise discretion at all or relied on an impermissible basis for refusing to impose an exceptional sentence. *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017). Impermissible bases for declining a request for an exceptional sentence include race, gender, or religion, for example. *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997).

"A trial court errs when 'it refuses categorically to impose an exceptional sentence below the standard range under any circumstances' or when it operates under the 'mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence for which [a defendant] may have been eligible.'" *McFarland*, 189 Wn.2d at 56 (quoting *Garcia-Martinez*, 88 Wn. App. at 330). "[A] trial court that has considered the facts and has concluded that there is no basis for an exceptional sentence has exercised its discretion, and the defendant may not appeal that ruling." *Garcia–Martinez*, 88 Wn. App. at 330.

In his sentencing memorandum and at the sentencing hearing, Hill argued that Salaverry, was, "[t]o a significant degree . . . a willing participant or aggressor.'" CP at 242 (citing RCW 9.94A.535(1)(a)). The State did not address the exceptional sentence argument. Hill addressed the court and asked it to consider "the unique circumstances of [his] actions." 7 RP at 563. In response, the court discussed how it was concerned about Hill's conduct after watching the video. The court then discussed Hill's high offender score and what Hill could do to turn his situation around. It issued a standard range sentence but did not address Hill's request on the record.

Although the court did not explicitly state on the record that it was denying Hill's request for an exceptional sentence, it did discuss what it thought after viewing the video. The record does not indicate that the court categorically refused to exercise its discretion to consider an exceptional sentence under any circumstance. We conclude that the court impliedly considered an exceptional sentence and rejected it, rather than categorically refusing to exercise its discretion.

VI.    SAG

    A.    Insufficient Evidence

Hill argues that there was insufficient evidence for either entering or remaining unlawfully, because no one testified at trial that Salaverry had authority to expel or physically remove a customer from the store.  We disagree.

The to convict instruction for burglary in the first degree read:

> To convict the defendant of the crime of burglary in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about the 31st day of August, 2019, the defendant entered or remained unlawfully in a building;
> (2) That the entering or remaining was with intent to commit a crime against a person or property therein;
> (3) That in so entering or while in the building or in immediate flight from the building the defendant assaulted a person; and
> (4) That any of these acts occurred in the State of Washington.

CP at 166 (Instr. 25).

The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).  A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.  *Id*.  We defer to the trier of fact on issues of credibility of witnesses and the persuasiveness of the evidence.  *Id*. at 874-75.

Although there was no explicit testimony that Salaverry had the authority to expel Hill, testimony from the store manager, Muridan, shows that he also told Hill to leave "at least five times [to] his face."  3 RP at 203.  There was sufficient evidence to prove that Hill remained unlawfully.  As stated above, burglary is not an alternative means crime, and therefore the State did not have to present sufficient evidence that Hill entered unlawfully.

21

Hill also argues that there was insufficient evidence to show "intent to commit a crime against persons or property." The intent required for burglary is intent to commit *any crime* inside the burglarized premises. *State v. Bergeron*, 105 Wn.2d 1, 4, 711 P.2d 1000 (1985).

Based on the cases cited in his SAG, Hill appears to argue that the State improperly relied solely on a permissive inference of criminal intent based on the proof that he unlawfully remained within Urban Bud. RCW 9A.52.040 provides that intent to commit a crime may be inferred when a person enters or remains unlawfully. In cases where this permissive inference is relevant, jury instructions are given to inform the jury that it may, but is not required to, infer intent. *See* e.g. *State v. Grayson*, 48 Wn. App. 667, 670, 739 P.2d 1206 (1987). However, the jury was not given the permissive inference instruction, and the State did not argue that the jury should infer his intent solely based on the fact that he remained unlawfully. The cases cited by Hill are inapplicable here.

After being asked to leave several times, Hill chose to move towards the back of the store, rather than exiting out of the front door. He attempted to kick open the door to the employee breakroom and proceeded to purposefully destroy property within the store. Viewing the evidence and circumstances in a light most favorable to the State, and drawing all reasonable inferences therefrom, any rational trier of fact could have found that Hill had the intent to commit a crime when he remained unlawfully. Although Hill provided an alternate explanation for his actions, we defer to the trier of fact on issues of credibility of witnesses and the persuasiveness of the evidence.

B.      Ineffective Assistance of Counsel

Hill argues that he received ineffective assistance of counsel because his attorney failed to interview juror X to determine if they needed to be removed from the jury and for failing to object to "50+ instances of leading questions" by the prosecutor. SAG at 2.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011).

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on a claim of ineffective assistance of counsel, the defendant must show both that defense counsel's representation was deficient and that the deficient representation prejudiced the defendant. *Grier*, 171 Wn.2d at 32-33. If either prong is not satisfied, the defendant's claim fails. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004). "Deficient performance is performance falling 'below an objective standard of reasonableness based on consideration of all the circumstances.'" *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (quoting *State v. McFarland*, 127 Wn.2d 322, 334–35, 899 P.2d 1251 (1995)).

Hill cannot show that this his counsel's failure to question juror X fell below an objective standard of reasonableness based on all of the circumstances. The jury had already completed deliberation on three of the four counts and had informed the court that it was deadlocked on the fourth. His counsel questioned the affected juror and moved for a mistrial. Additionally, given that juror X's statement was not a threat, there was no reason to demand further inquiry. His counsel's performance was not deficient. In regard to his assertion that he received ineffective assistance because his counsel failed to object to the prosecutor's leading questions, he fails to state what effect, if any, this failure had on the verdict. Because he fails to show prejudice, his claim of ineffective assistance fails.

23

C.      Prosecutorial Misconduct

Hill asserts that the prosecutor committed misconduct by asking "50+" leading questions. SAG at 2.

To show prosecutorial misconduct, the defendant bears the burden to establish that a prosecutor's conduct was improper and that it resulted in prejudice that had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 759–61. Hill fails to explain what effect, if any, the prosecutor's conduct had on the verdict. This argument is without merit and we do not consider it.

We affirm.

_____
Veljacic, J.

We concur:

_____
Sutton, J.

_____
Glasgow, A.C.J.